**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Kludka, | No. CV-08-01806-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Qwest Disability Plan, et al., | |
| Defendants. | |

Plaintiff Richard Kludka filed this lawsuit against Defendants Qwest Disability Plan, Qwest Communications Inc. Health Insurance Plan, and Qwest Employee Benefit Plans for disability income benefits pursuant to the Employee Retirement Income Security Act of 1974 Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) ("ERISA"). Doc. 1 at 3. The parties filed cross motions for summary judgment. Docs. 36, 37. On April 7, 2010, the Court granted Defendants' motion. Doc. 45. Kludka appealed, and the Ninth Circuit reversed and remanded for the Court to reconsider its abuse of discretion analysis in light of two procedural irregularities and an erroneous factual finding. Doc. 49-1 at 2.

The parties have filed briefs on remand. Docs. 58, 59, 60. Defendants have also filed a motion to strike Kludka's references to facts outside the administrative record and other matters. Doc. 61. The Court heard oral argument on May 10, 2012. For reasons that follow, the Court will grant summary judgment in favor of Defendants and will grant in part and deny in part Defendants' motion to strike.

1   **I.      Background.**

2          Kludka worked for Qwest and was a participant in the Qwest Disability Plan ("the

3   Plan").  The Plan promised long-term disability benefits for participating employees who,

4   because of disability, were "unable to engage in any occupation or employment, which

5   inability is supported by Objective Medical Documentation," or who were "unable to

6   engage in any occupation or employment . . . other than a job that pays less than 60% of

7   [the Participant's] Base Pay at the time the Participant terminates employment due to the

8   Disability."  Doc. 36-10 at 10-11.  Under the terms of the Plan, participants receiving

9   long-term disability benefits are subject to periodic reviews to assess their conditions.

10         The Plan is funded by Qwest.  The Plan administrator is the Employee Benefits

11  Committee ("EBC") "appointed by the Executive Vice President of Human Resources of

12  Qwest[.]"  *Id.* at 14.  The Plan provides that the EBC may delegate its responsibilities as

13  Plan administrator to a third party administrator "by entering into a contract" for the third

14  party to act as the Plan administrator.  *Id.* at 16.  EBC entered into a contract with Reed

15  Group Ltd., which does business as Qwest Disability Services ("QDS").  *See* Doc. 36-11

16  at 2-39.  Based on this contract and the terms of the Plan, QDS acted as the third-party

17  administrator and had discretionary authority to administer the Plan and "determine a

18  Participant's . . . eligibility for benefits under the plan[.]"  Doc. 36-10 at 18; Doc. 36-11

19  at 2.

20         Kludka began receiving disability benefits on July 19, 1999, due to "Major

21  Depressive Disorder, Panic Disorder with Agoraphobia and Post Traumatic Stress

22  Disorder."  Doc. 37-1, ¶ 2.  In April of 2006, QDS informed Kludka that his eligibility

23  for benefits was under a regular review and asked Kludka to provide authorization for

24  QDS to obtained medical records from Kludka's medical providers.  Doc. 36-8 at 45-47.

25  QDS sent a follow-up request when Kludka did not return the authorization.  Doc. 36-8 at

26  43-44.  QDS obtained medical records from Kludka's treating psychiatrist, Dr. Doumani-

27  Semino, on May 19, 2009, and from his therapist, Mr. Owen Golden, on May 17, 2006.

28  Doc. 36-8 at 13-37.  QDS also contacted Mr. Owen on May 14, 2006, and asked that he

complete a questionnaire regarding Kludka's condition.  Doc. 36-8 at 38-42.  QDS had made similar requests – and received responses – from Mr. Owen and Dr. Doumani-Semino in the past.  Doc. 36-8 at 55-102.

As part of its review, QDS obtained an independent medical opinion dated June 10, 2006, from Dr. Kelly Clark, a psychiatrist, who opined that Kludka no longer was disabled and gradually could return to work.  Doc. 36-8 at 7-11.  Dr. Clark reviewed Kludka's medical records and history, including the submissions from Mr. Owen and Dr. Doumani-Semino, and opined that Kludka "could return to work half days for one month, then return to work without restrictions."  *Id.* at 10.  QDS also obtained a Transferable Skills Analysis ("TSA") from Genex Services, Inc..  The TSA determined that Kludka could work in several occupations and earn 60% or more of his former salary.  *Id.* at 1-6.

Based on these reports, QDS notified Kludka on June 22, 2006 that he was ineligible for continued long-term disability and that his benefits would be terminated effective August 1, 2006.  Doc. 36-4 at 70-74.  In explaining the basis for the decision, the QDS letter quoted virtually all of Dr. Clark's report (compare Doc. 36-4 at 70-72 with Doc. 36-8 at 7-11), summarized the findings of the TSA, including the list of employment opportunities found available for Kludka (Doc. 36-4 at 72), and quoted the Plan language under which Kludka was determined no longer to be disabled (*id.* at 70, 72-73).  The letter did not explain the determination in plain-English terms and did not state what additional information Kludka could submit to establish his disability.

Kludka questioned this determination, and on August 31, 2006, QDS hired Dr. Robert Bevan to conduct an independent medical examination ("IME") of Kludka. Doc. 36-7 at 77-88.  Dr. Bevan examined Kludka in person for one hour and 45 minutes and then administered the Minnesota Multiphase Personality Inventory test ("MMPI-2"). *Id.* at 87.  On the basis of this exam and a review of Kludka's medical records (*id.* at 84-86), Dr. Bevan concluded that "Kludka could work two hours daily currently, and as his avoidance of leaving home diminishes, he could presumably increase his hours back to full-time without restriction."  *Id.* at 87.  Dr. Bevan recommended that Kludka "be

restricted to two hours of work daily for one month, four hours daily for one month, and then full time without restrictions." *Id.* at 88.  On September 18, 2012, QDS informed Kludka by telephone that it was reinstating his disability benefits through the end of the year, with the last check to be issued on January 1, 2007, "to help him do a slow transition back into the work force."  Doc. 36-4 at 11; *see also* Doc. 36-7 at 31.  QDS provided Kludka with a copy of Dr. Bevan's report in a letter dated September 22, 2006. Doc. 36-7 at 74.

In late January of 2007, QDS obtained another written medical review from Dr. Clark, who again reviewed Kludka's file.  Dr. Clark also spoke by phone with Kludka's treating physician, Dr. Doumani-Semino.  Doc. 36-7 at 28-29.  Dr. Doumani-Semino reported that she had recommended that Kludka undergo a sleep study to rule out apnea and also that he enter vocational rehabilitation to prepare to reenter the workforce, neither of which he had done.  *Id.* at 29.  Dr. Clark opined that Kludka no longer was disabled and recommended that he "return to work in a graduated manner, such as half-days for a month and then full time[.]"  *Id.* at 28-30.

Based on the opinions of Drs. Clark and Bevan and the Genex TSA, QDS notified Kludka on February 5, 2007 that his long-term disability benefits were terminated. Doc. 36-7 at 31-36.  The letter quoted virtually all of Dr. Clark's 2006 and 2007 reports (*id.* at 32-34), summarized Dr. Bevan's report (*id.* at 33), summarized the TSA results, including providing a list of the employment opportunities it had found available (*id.* at 34-35), and quoted the Plan language under which Kludka was determined no longer to be disabled (*id.* at. 31, 35).  *Id.*  The letter did not explain the determination in plain-English terms and did not state what additional information Kludka could submit to establish his disability.  Kludka's disability payments were terminated as of February 1, 2007.  *Id.* at 31.

Kludka appealed the decision on July 24, 2007.  The next day, QDS sent Kludka a letter acknowledging his appeal and advising him that he could submit additional materials, including documentation from his medical providers.  Doc. 36-7 at 24.  The

letter enclosed a list of 60 medical documents and notes considered by QDS in making its decision and invited Kludka to submit any "additional information that you would like the Board to review." *Id.* at 24-26.[1]  The letter did not identify documents Kludka should submit to perfect his appeal.  At Kludka's request, QDS extended the time for Kludka to provide documents to September 19, 2007. *Id*. at 23.

On September 18, 2007, Kludka faxed QDS a four-page, single-spaced letter recounting his medical history.  Doc. 36-4 at 66-69.  Kludka sent QDS relevant medical records and provided documentation from Dr. Doumani-Semino and Mr. Golden.  Doc. 36-4 at 77-90.  Kludka noted that he recently had been examined by Magellan Health Services and stated that he shortly would be providing its report.  The report was received by QDS on September 20, 2007.  Doc. 36-4 at 49-50.  Kludka's appeal letter recounted in detail his course of treatment from 2003 through August of 2007, quoted from treatment notes, recounted diagnoses, and provided test results.  *Id.*  He also included a letter from his brother attesting to his disability.  Doc. 36-4 at 75.

After receiving the additional materials, QDS sought new opinions from Dr. Marcus Goldman, a psychiatrist (Doc. 36-4 at 41-47), and Dr. Leonard Sonne, a medical doctor (Doc. 36-4 at 34-40).  Dr. Goldman examined medical records obtained from Kludka's doctors, including treatment notes, letters, and medical reviews from more than 70 visits Kludka made to medical providers between 2000 and 2007, as well as other materials in the file and submitted by Kludka.  *Id.* at 41-47.  Dr. Sonne examined extensive medical records, including records related to a heart attack suffered by Kludka and resulting triple bypass surgery in May of 2007.  Doc. 36-4 at 34-39.  Both Dr. Goldman and Dr. Sonne found that Kludka was capable of working.  Neither recommended that Kludka work on a limited basis.

---

[1] The list of documents contained in the record states that it was prepared on June 26, 2009.  Doc. 36-7 at 26.  The Court assumes this is the date on which it was later printed, and that it contains an accurate list of the documents identified in the July 25, 2007 letter because of its placement in the record and the fact that the documents included in the list cover the time period from December 28, 2000 to January 11, 2007.

Based on these opinions, QDS again determined that Kludka was not eligible for long-term disability benefits and, on October 9, 2007, informed Kludka by letter that it was upholding the denial of his benefits. *Id.* at 21-33. The letter quoted verbatim the contents of the February 5, 2012 letter denying disability benefits, including the recitation of Dr. Clark's reports, the summary of Dr. Bevan's findings, a summary of the TSA, and quotation of the Plan language under which the determination was made. *Id.* at 21-26. The letter quoted virtually all of the report of Dr. Goldman (compare Doc. 36-4 at 26-31 with Doc. 36-4 at 41-47) and the text portions of Dr. Sonne's report (compare Doc. 36-4 at 31-33 with Doc. 36-4 at 34-39). The letter did not explain the determination in plain-English terms and did not state what additional information Kludka could submit to establish his disability. Kludka subsequently filed this lawsuit. Doc. 1.

## II.   Abuse of Discretion Review.

When a plan "unambiguously provide[s] discretion to the administrator" to interpret the terms of the plan and make final benefits determinations, and there is no evidence of wholesale and flagrant procedural violations of ERISA, the administrator's decision is subject to abuse of discretion review. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963, 971 (9th Cir. 2006). This Court previously found that abuse of discretion review is appropriate in this case because QDS enjoys such discretion and Kludka has presented no evidence of wholesale and flagrant procedural violations of ERISA. Doc. 45 at 8-11. The Ninth Circuit did not disturb this finding on appeal, and in fact specifically remanded the matter to this Court to determine whether QDS "abused its discretion" when it terminated Kludka's disability benefits. Doc. 49-1 at 2. At oral argument, counsel for Kludka agreed that the appropriate standard is abuse of discretion.

Abuse of discretion review is less deferential when the plan administrator has a conflict of interest. *Id.* In this case, the Court previously found that QDS does not have a conflict of interest that would warrant a higher level of scrutiny. Doc. 45 at 11-12. Kludka challenged this finding on appeal, but the Ninth Circuit chose not to address it. Doc. 49-1 at 3. On remand, Kludka has made no argument and presented no new

1   evidence to support a conflict-of-interest finding.  The Court therefore stands by its

2   previous conclusion and will apply traditional abuse of discretion review to this case.

3       In *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011),

4   the Ninth Circuit explained that an "abuse of discretion" occurs in an ERISA case when

5   the Court is "left with a definite and firm conviction that a mistake has been committed."

6   *Id.* at 676.  The Court of Appeals stressed that a court "may not merely substitute [its]

7   view for that of the fact finder," but must consider whether the plan administrator's

8   decision was "(1) illogical, (2) implausible, or (3) without support in inferences that may

9   be drawn from the facts in the record."  *Id.* (internal quotations and citations omitted).

10  **III.   Discussion.**

11      QDS made two procedural errors in this case.  First, it failed to explain to Kludka

12  what specific information he needed to present, and why, to perfect his claim, as required

13  by 29 C.F.R. § 2560.503-1(g)(1).  Doc. 49-1 at 3.  Second, QDS failed to request relevant

14  records from the Social Security Administration ("SSA"), from which Kludka was

15  receiving disability benefits, and failed to explain why its disability conclusion differed

16  from the SSA's.  *Id.*  The Ninth Circuit also found that the Court made an erroneous

17  factual finding when it accepted Defendants' factual assertion that Qwest had offered

18  Kludka his former job.  *Id.* at 3-4.  In fact, Qwest did not offer Kludka his old position.

19  Doc. 59 at 1-2.  The Ninth Circuit remanded for the Court "to reevaluate whether QDS

20  abused its discretion, in light of the procedural irregularities and the fact that Qwest had

21  not offered to reinstate Kludka in his previous job with accommodations."  Doc. 49-1 at

22  4.  The Court will address each of these issues individually to determine whether they

23  reflect an abuse of discretion.  The Court will then consider their cumulative effect for the

24  same purpose.

25      **A.    Individual Issues.**

26      **1.    QDS' Failure to Comply with 29 C.F.R. § 2560.503-1(g)(1)(iii).**

27      ERISA regulations require that a plan administrator provide written or electronic

28  notification of any denial of benefits.  29 C.F.R. § 2560.503-1(g)(1).  The notification

must set forth "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary[.]"  29 C.F.R. § 2560.503-1(g)(1)(iii).  This notification must be made "in a manner calculated to be understood by the claimant."  *Id.* at (g)(1).  The Ninth Circuit has interpreted this regulation as requiring "a meaningful dialogue between ERISA plan administrators and their beneficiaries."  *Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997); *see also*, *Salomaa*, 642 F.3d at 680.  Reasons for a denial of benefits must be explained by plan administrators "in reasonably clear language," and if the administrators "believe that more information is needed to make a reasoned decision, they must ask for it."  *Booton*, 110 F.3d at 1463.

Defendants' February 5, 2007 denial letter informed Kludka that documentation in support of a disability must "include Objective Findings, diagnosis and any other information relevant to the nature and duration of the Disability, as well as a plan for treatment or management of the problem[.]"  Doc. 36-7 at 35.  The Ninth Circuit found, however, that this "generic reproduction of the Plan's terms . . . did not explain to Kludka what specific information was needed and why."  Doc. 49-1 at 3.

Cases that have found an abuse of discretion on the basis of a failure to comply with this dialogue requirement have generally involved situations where the plan administrator knew of specific missing information but failed to notify the claimant of the need for the information, or where the administrator gave illogical or inconsistent grounds for the denial.  In *Booton*, Marjorie Booton filed a claim with Aetna, pursuant to her employer's ERISA-covered medical benefit plan, after she received treatment for an accident that partially dislodged her front teeth.  110 F. 3d at 1462 & n.1.  Booton's request for coverage included a number of procedures done to her back teeth to allow them to serve as a splint for the front teeth.  *Id.* at 1462.  Aetna denied Booton's claim for these treatments on the ground that she had not sustained injury to her back teeth, despite Booton's and her lawyer's repeated explanations that the procedures were necessitated by the accidental injury.  *Id.* at 1462-3.  The Ninth Circuit found that Aetna abused its

discretion because it failed to give a rational explanation for why the procedures were not related to the injury, stating only that the back teeth were not injured, and failed to request pre-accident x-rays or explanations from Booton's dentists connecting the treatment of the back teeth to the injury – both pieces of information that Aetna's own consulting dentist informed Aetna could help support Booton's claim. *Id.* at 1464.

In *Saffon v. Wells Fargo & Company Long Term Disability Plan*, 522 F.3d 863 (9th Cir. 2008), a plan administrator failed to identify known information the claimant needed to perfect her claim and failed to provide a rational basis for denial of the claim. Metlife, the claims administrator and insurer for Wells Fargo, determined that claimant Graciela Saffon no longer qualified for long-term disability benefits due to degeneration of her cervical spine – a condition previously confirmed by numerous MRI scans and x-rays – because Metlife's reviewing doctor stated that her file lacked "detailed, objective, functional findings" or tests that would show she could not return to work. *Id.* at 866. Saffon's doctor responded with a detailed letter discussing Saffon's symptoms, his failed attempts to alleviate her pain through medication, and pointing to an MRI showing degenerative disease. *Id.* at 869. When Metlife still rejected Saffon's claim, Saffon appealed, and her doctor submitted another letter and a recent MRI showing that her cervical spine had not changed. *Id.* Metlife rejected the appeal because there were not enough "objective medical findings" that Saffon's symptoms precluded her from work. *Id.* at 869-70. Only in its final denial determination did Metlife state that Saffon had not furnished a Functional Capacity Evaluation to substantiate her doctor's diagnosis. *Id.* at 871. Metlife also discounted the recent MRI because it was unchanged from the previous MRI. *Id.* The Ninth Circuit found this to be error because "[i]nsofar as MetLife believed that a Functional Capacity Evaluation, or some other means of objectively testing Saffon's ability to perform her job, was necessary for it to evaluate Saffon's claim, it was required to say so at a time when Saffon had a fair chance to present evidence on this point." *Id.* The court also found Metlife's explanation discounting the MRI illogical because it had interpreted the previous MRI as proof of disability and gave no reason

1   why Saffon would now need to document a progression in the degeneration.  *Id.*

2          Similarly, in *Salomaa*, the Ninth Circuit found procedural error where the

3   administrator based its denial of benefits on the absence of "objective medical evidence"

4   but failed to explain what evidence it wanted.  642 F.3d at 679.  *Salomaa* differs from

5   *Booton* and *Saffon* because it involved Salomaa's long-term disability claim due to

6   chronic fatigue syndrome, a condition for which there is no objective laboratory test.

7   Diagnosis is based on matching symptoms to those described in a list from the Center for

8   Disease Control, ruling out other possible disorders, and thoroughly reviewing the

9   patient's medical history.  *Id.* at 677.  The court found that the plan administrator erred

10  because it continually shifted its basis for denial, made "absurd" requests for objective

11  documentation through lab findings or x-rays that were irrelevant to the claimant's

12  condition, and disregarded the unanimous opinions of four examining physicians without

13  explanation and without giving them an opportunity to comment or provide additional

14  tests or exams as appropriate.  *Id.* at 671, 680-81.

15         The procedural error in this case does not rise to the level of these Ninth Circuit

16  cases.  Unlike *Booton* and *Saffon*, where the plan administrators knew of but failed to

17  request specific missing documentation that would help complete the record, and unlike

18  *Salomaa*, where the plan administrator obfuscated the review process by shifting the

19  basis for its denial and asking for irrelevant documentation, there is no evidence that

20  Defendants knew of specific, relevant information missing from the record or requested

21  irrelevant documentation.   As explained above, QDS contacted Kludka's medical

22  providers and obtained copies of Kludka's detailed records.  Dr. Bevan's report makes

23  clear that he read and considered Kludka's past records, including statements and

24  progress reports from Dr. Doumani-Semino and Mr. Golden, in addition to his personal

25  examination of Kludka. Doc. 36-7 at 84-86.   Dr. Clark spoke personally with Dr.

26  Doumani-Semino about Kludka. Doc. 36-7 at 34. The reviews conducted by Dr. Clark

27  (Doc. 36-7 at 89-93), Dr. Goldman (Doc. 36-4 at 41-47), and Dr. Sonne (Doc. 36-4 at 34-

28  40) all include discussions of Kludka's past records and information from Dr. Doumani-

Semino and Mr. Golden.  The Court has not found, and Kludka has not identified, any evidence that Kludka could have provided additional information relevant to his condition.

QDS's denial letters do not reveal a shifting of reasons for the benefits denial. QDS's initial denial letters show that its reviewing doctors examined the medical documentation of Kludka's treating providers and determined that the frequency of his panic attacks had decreased significantly from the daily attacks in 2002, that his panic disorder was currently under control, and that no known symptoms would preclude him from a gradual return to work.  *See* Docs. 36-7 at 96-98 (June 21, 2006 letter), 36-4 at 70-72 (June 22, 2006 letter).  QDS's February 5, 2007 letter came to the same conclusion following Dr. Bevan's IME and administration of the MMPI-2.  Doc. 36-7 at 31-34. QDS's final denial letter of October 9, 2007 contains references to the previous information as well as multiple additional submissions including additional notes from Kludka's therapist, Mr. Golden, and information related to Kludka's May 2007 hospitalization and triple bypass surgery.  Doc. 36-4 at 21-33.  Each of these letters communicates the consistent conclusion that the psychological and medical evidence did not support Kludka's claims of disability.  There is no evidence that the explanations given were illogical or inconsistent, or that the lack of meaningful dialogue with Kludka resulted in an incomplete record upon which QDS based its final disability determination. QDS's procedural deficiency in failing to explain its review procedures therefore does not lead the Court to a firm conviction that a mistake has been made or that the administrator's final determination was illogical, implausible, or without support from the facts in the record.  *Salomaa*, 642 F.3d at 676.

Kludka argues on remand that QDS also committed procedural error by failing to provide him with copies of the medical reports it considered when making its determination.  This appears to be an argument raised for the first time on remand and is not supported by citations to the record.  Moreover, as noted in the background section of this order, QDS did provide Kludka with a copy of Dr. Bevan's IME report.  Doc. 36-7 at

74.   QDS also quoted verbatim the reports of Drs. Clark, Goldman, and Sonne in its termination and denial-of-appeal letters. Doc. 36-7 at 31-36, Doc. 36-4 at 21-33.

Kludka had an opportunity to address the Bevan report that was provided to him before a final decision was made.   Although quoting the Clark report in the initial termination letter did not afford Kludka an opportunity to address it before the initial decision was made, Kludka did have an opportunity to address it in his appeal and did so. Doc. 36-4 at 67.   Quoting the Goldman and Sonne reports in the denial-of-appeal letter did not afford Kludka a reasonable opportunity to address them.

The Ninth Circuit has suggested that plan administrators commit procedural error under ERISA when they make decisions on the basis of internal medical reports that are not provided to the claimant. *Salomaa*, 642 F.3d at 679-80.   As with the procedural error discussed above, however, this error does not lead the Court to a firm conviction that a mistake has been made or that the administrator's final determination was illogical, implausible, or without support from the facts in the record. *Id*. at 676.   Kludka was able to comment on the most important report – the Bevan IME report – and was able to comment on Clark's findings before the final appeal decision was made.   The Sonne report focused largely on Kludka's heart condition, which is not the basis for his disability claim, and the Goldman report merely confirmed the findings made by Bevan and Clark.   All of the reports were based on extensive reviews of Kludka's medical history and records.   In addition, QDS contacted and obtained information from Kludka's medical providers, including speaking directly with his treating psychiatrist.   Given this basis for the QDS decision, and the lack of any indication that relevant information was overlooked or disregarded, the Court cannot conclude, much less reach a firm conviction, that QDS's decision was a mistake.

### 2.      QDS' Failure to Evaluate Kludka's SSA Records.

It appears Kludka was awarded SSA disability benefits around the time of his original disability in 1999 or 2000.   The termination and denial-of-appeal letters sent by QDS to Kludka in 2006 and 2007 do not discuss the fact that Kludka had been awarded

benefits by the SSA, and did not consider what effect this fact should have on the QDS disability decision.  That QDS knew of Kludka's SSA award is confirmed by its mention in Dr. Bevan's report.  Doc. Doc. 36-7 at 78.  The Ninth Circuit found that QDS's failure to address the SSA determination was a procedural error under ERISA.  Doc, 49-1 at 3.

QDS had, on more than one occasion, asked that Kludka keep it informed "of any changes to any other disability income (i.e. and award/disallowance of Social Security or a change in Workers' Compensation payments)."  Doc. 36-8 at 48, 83; *see also* Doc. 36-10 at 25, Plan § 4.12(b) ("A Participant must provide a copy of all Social Security determinations to the Plan Administrator within 30 days of receipt by Participant.").  There is no evidence in the record that Kludka provided any information to QDS concerning the SSA determination.  Kludka did not, for example, mention SSA benefits in his detailed appeal letter.  Doc. 36-4 at 66-69.  Counsel for Kludka argued in his memorandum after remand from the Ninth Circuit that the SSA had confirmed Kludka's disability award on at least one occasion before QDS terminated Kludka's benefits (Doc. 58 at 2), but has provided no evidence of this fact.  Counsel confirmed at oral argument that there is no evidence in the record that the SSA ever reviewed or confirmed Kludka's disability after the initial SSA determination.  The Court will assume, therefore, that the SSA's original determination remained in effect when QDS evaluated Kludka's condition in 2006 and 2007, but not that the SSA engaged in any subsequent review of Kludka's condition.

In its remand order, the Ninth Circuit referred the Court to *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009), in which it addressed a plan administrator's obligation to take into account a contrary SSA disability determination.  See Doc. 49-1 at 3.  *Montour* explained that while plan administrators are not bound by SSA determinations, complete disregard for a contrary SSA disability finding without explanation raises questions about the administrator's deliberative process and may indicate a failure to consider relevant evidence.  588 F.3d at 635.

*Montour* does not, however, resolve the issue in this case.  In *Montour*, Hartford's

failure to explain why it reached a different result from the SSA was only one of several factors that led the Court of Appeals to conclude that Hartford had abused its discretion. *See id.* at 637.  Hartford had a conflict of interest that resulted in "enhanced skepticism" of its disability determination, and it took no steps to ensure that its review of benefits decisions would be neutral.  *Id.* at 631, 634.   The SSA confirmed the claimant's continuing disability status in April 2005 and December 2006, just over a year before and a few months after Hartford denied Montour's claim for benefits in August 2006.  588 F.3d at 635.  Montour also regularly apprised Hartford of his continuing status with the SSA and immediately forwarded the April 2005 SSA determination, which Hartford acknowledged in its denial but failed to discuss.  *Id.* at 635, 637.  In addition, Hartford conducted a "pure paper" review of Montour's condition and failed "to conduct an in-person medical evaluation of him."  *Id.* at 634.

None of these additional factors can be found in this case.  Moreover, QDS's denial relied, in part, on newly-documented information, including an independent medical exam performed on August 31, 2006, a MMPI-2 evaluation indicating that Kludka's clinical reports possibly gave an exaggerated picture of his current problems, a GAF score consistent with mild symptoms, and recent discussions with Kludka's treating physician in which she stated that she recommended he attend vocational rehabilitation. *See* Doc. 36-4 at 24-25.  Because there is no evidence that the SSA considered Kludka's condition after its initial disability determination in 2000, there is no basis for concluding that the SSA had ever considered similar information about Kludka's decision.  This of course does not excuse QDS's failure to consider the SSA determination or to request information about it from Kludka, but it does prevent the Court from reaching a firm conviction that QDS made a mistake in its disability decision.

This case also differs factually from *Metro Life Insurance Company v. Glenn*, 554 U.S. 105, 118 (2008).  In *Glenn*, Metlife approved Glen for an initial 24 month period of benefits in June 2000, but denied continuation of the benefits in 2002 under the stricter SSA-type standard that applied after the initial 24 month period expired even though the

SSA itself determined in April of 2002 that Glenn was permanently disabled. 554 U.S. at 109. The Supreme Court found that Metlife's disregard of the SSA's contemporaneous disability determination – after Metlife required Glenn to apply for SSA benefits to offset its own payments – was an "important factor" in the abuse of discretion analysis and added weight to Metlife's conflict of interest. *Id.* at 118. In *Glenn*, the SSA disability determination occurred only two months prior to Metlife's own 24 month review, and the SSA determined that the claimant's disability was permanent. There is no evidence in the record of this case upon which to conclude that the SSA made a decision near-in-time to QDS's, and no evidence that QDS had a conflict of interest.

### 3. Kludka's Employment Prospects.

The Ninth Circuit noted in its remand order that Dr. Bevan, the only reviewing doctor who personally examined Kludka, determined that Kludka could work two hours a day and "presumably increase his hours back to full time." Doc. 49-1, citing Doc. 36-7 at 87. Dr. Bevan recommended that Kludka be restricted "to two hours a day for one month, four hours daily for one month, and then full time without restrictions." *Id.* (citing Doc. 36-7 at 88). The Ninth Circuit noted that "Kludka would have to convince an employer to hire him on a part-time, gradually escalating basis, even while knowing that he had received disability benefits for severe psychological problems since 1999," and stated that if the Court had analyzed Kludka's situation under these conditions it may have determined that Kludka was "'unable to engage' in meaningful employment and [was] disabled under the terms of the Plan." *Id.* at 4.

Section 1.14 of the Plan defines a participant as disabled if he is

> unable to engage in any occupation or employment, for which he may reasonably become qualified for by training, education or experience, other than a job that pays less than 60% of his Base Pay at the time the Participant terminates employment due to the Disability.

Doc. 36-10 at 10-11, Plan § 1.14.

Defendants argue that under the terms of the Plan "QDS was not required to assess how difficult it would be for Kludka to find a job – which depends, at least partially, on

his motivation and effort," but only to assess Kludka's "<u>ability</u> to work at, or <u>reasonably become qualified for</u>, a job paying more than 60% of his pre-disability earnings." Doc. 59 at 4 (emphasis in original).  Defendants assert that Kludka could have become reasonably qualified for a number of jobs in the relevant pay range in a relatively short period of time and that QDS continued to pay full benefits to allow him to make the gradual transition from part-time to full-time work between June 2006 and February 2007, a period that exceeded by several months the two-month transition period Dr. Bevan recommended.  *Id.* at 6.  The record shows that Kludka was informed on June 21, 2006 that his benefits would end effective August 1, 2006.  Doc. 36-7 at 96.  It also shows that after Dr. Bevan conducted the IME on September 18, 2006, Kludka was informed that he would continue to receive benefits until January 1, 2007 to "help him do a slow transition back into the work force."  Doc. 36-4 at 11; Doc. 36-7 at 31.

Notwithstanding Kludka's lack of a specific job offer, the Court finds that QDS did not abuse its discretion when it determined that Kludka could reasonably become qualified for a job paying 60% or more of his former base pay.  Kludka argues that the Genex vocational expert who prepared the TSA stated that "[w]ith regards to the restriction of working half-days for a month . . . I could not identify any occupations that would satisfy the gainful wage."  Doc. 58 at 10, *see* Doc. 36-8 at 3.  But the report goes on to identify six full-time positions that would pay 60% or more of Kludka's prior salary and would be appropriate for Kludka based on his prior work history, education, experience, and physical abilities.  Doc. 36-8 at 3-6.  As Defendants argue, there was no requirement that Kludka convince an employer to hire him on a graduated basis over a period of two months because there are any number of ways, including temporary work or volunteer work, through which Kludka could prepare to re-enter the workforce full-time while continuing to receive benefits from Defendants.  *See* Doc. 59 at 7.

Kludka argues that the jobs listed in the TSA require at least three months to learn (Doc. 58 at 10) and that two of the jobs – "Data Communications Technician" and "Cable Splicer" – had Specific Vocational Preparation ("SVP") ratings of "7," meaning they

required two to four years of training to reach proficiency.  Doc. 60 at 4.  The explanation from the Dictionary of Occupational Titles, cited by Kludka, states that SVP can include "vocational education, apprenticeship training, in-plant training, and essential experience in other jobs."  Doc. 60-1 at 2.  As a result, Kludka's previous education and job experience at Qwest, where he worked as a Network Technician, could be considered in determining his qualification for the positions listed in the TSA.  Additionally, two of the jobs listed in the TSA had an SVP of one to three months, and two others had a range of three to six months (*see id.* at 4-5).  Given these facts, and the fact that QDS extended benefits to Kludka – ultimately for six months – for the purpose of transitioning to full-time employment, the Court does not find that the TSA was flawed as Kludka contends or that it failed to provide a reasonable basis for QDS to conclude that Kludka could "reasonably become qualified" for appropriate work had he sought to do so.

Finally, Kludka's disability benefits were to ensure against disability, not unemployment.  The Plan defines "disablility" in terms of a Participant's inability to "reasonably become qualified" for work paying not less than 60% of his former base pay, not in terms of his inability to find such work in the local economy.  In *Pannebecker v. Liberty Life Assurance Company of Boston*, 542 F.3d 1213, 1218-19 (9th Cir. 2008), the Ninth Circuit determined that a denial of benefits must be evaluated by looking to the plain language of the plan, and declined to import considerations such as a claimant's current salary or station in life into a disability determination where those factors were not stated in the plan.  By the same token, this Court cannot import into the Qwest Plan a requirement that Kludka have a job available before he can be found no longer disabled.  The record shows that QDS had a reasonable basis, including Dr. Bevan's IME and the TSA, for concluding that Kludka could transition back to qualifying full time employment while receiving continued benefits.  The Court is not firmly convinced that this was a mistake or was illogical, implausible, or without support from facts in the record.  *Salomaa*, 642 F.3d at 676.

1

**B.     Cumulative Effect of the Issues.**

2           Having concluded that the QDS errors individually do not establish an abuse of

3   discretion, the Court will now consider whether they cumulatively establish such abuse.

4   The Court will apply the same abuse of discretion standard applied above, asking whether

5   the errors leave the Court "with a definite and firm conviction that a mistake has been

6   committed," including whether the QDS decision was "(1) illogical, (2) implausible, or

7   (3) without support in inferences that may be drawn from the facts in the record."

8   *Salomaa,* 642 F.3d at 676.

9           QDS's errors were serious, but the Court cannot conclude that they caused it to

10  reach an incorrect conclusion in this case.   QDS requested and received extensive

11  medical records from Kludka's doctors, spoke personally with Kludka's treating

12  psychiatrist, conducted an in-person IME of Kludka that included administration of a

13  standardized psychological test (the MMPI-2), had Kludka's extensive medical records

14  reviewed twice by Dr. Clark and once each by Drs. Bevan, Goldman, and Sonne,

15  consulted different doctors on appeal than it had consulted in its initial denial, provided a

16  consistent explanation of the basis for its termination of benefits, obtained an analysis of

17  job availability from the Genex TSA, and extended disability benefits for the period

18  recommended by Drs. Clark and Bevan for Kludka to return to work.   QDS was not

19  operating under a conflict of interest.   Although QDS failed to consider the SSA's

20  decision to award benefits to Kludka, it appears that decision had been made five or more

21  years before QDS determined that Kludka was no longer disabled and did not take into

22  account the more current information upon which QDS relied.   Given the information in

23  the record and the analysis and testing provided by the QDS doctors, the Court is not left

24  with a definite and firm conviction that QDS made a mistake.   Nor does the Court find

25  any basis to conclude that QDS's decision was illogical, implausible, or without support

26  in the record.

27          Comparing this case to recent cases in which the Ninth Circuit has found an abuse

28  of discretion only confirms the Court's conclusion.   As already noted, the abuse of

discretion in *Montour* was based not only on the plan administrator's failure to consider SSA benefits, but also on Hartford's conflict of interest, its failure to take steps to ensure that its review decision was not influenced by the conflict of interest, the recency of the SSA's contrary determination, and the fact that Hartford conducted a "pure paper" review and declined to have the claimant examined in person.  588 F.3d at 631-35.  These additional aggravating factors simply are not present in this case.

In *Salomaa*, the administrator failed to consider an SSA award of benefits, failed to provide the claimant copies of the internal doctor reports upon which it relied, and failed to communicate its decision in plain English, all of which occurred in this case, although the internal doctor reports were disclosed to Kludka in part.  *Salomaa* also included the following relevant facts:   the plan administrator was operating under a conflict of interest and had "a financial incentive to cheat" (642 F.3d at 678), the review of Salomaa's condition was conducted purely on paper (*id.* at 676), the "plan's reasons for denial shifted, as old reasons, proved erroneous, were replaced by new ones" (*id*), and the SSA award was specifically provided to the plan administrator and yet was disregarded in the decision (*id.*).  These additional aggravating factors are not present in this case.

The plan administrator in *Saffon*, as here, failed to provide the claimant with a plan-English description of its actions or the additional information she should produce.  522 F.3d at 870.  But the administrator also labored under a conflict of interest (*id.* at 868) and its doctors conducted a purely paper review of the claimant's condition (*id.* at 869).  Even with these additional factors at play, the Ninth Circuit did not find an abuse of discretion, but instead remanded the case to the district court for that determination.  *Id.* at 874.

Finally, although *Booton* found an abuse of discretion based on the plan administrator's failure clearly to explain its denial of benefits and seek additional information (110 F.3d at 1464), there was much more in the record before the Ninth Circuit.  The claimant had submitted evidence of what the record would have contained

had the administrator done its duty.  This evidence, in the form of affidavits from the claimant's doctors, demonstrated conclusively that the administrator's decision was incorrect.  *Id.* at 1464-65.  No similar evidence exists in this case.

In short, the abundance of information considered by QDS and its four reviewing doctors, and the absence of any indication of information they missed or overlooked or that Kludka could have supplied, prevents this Court from concluding firmly that a mistake was made by QDS.  And significantly, the procedural errors in this case do not rise to the level of errors found to constitute an abuse of discretion in relevant Ninth Circuit cases.  The Court accordingly concludes that Kludka has failed to establish that Defendants abused their discretion in terminating his benefits.  The Court will again enter summary judgment in favor of Defendants and against Plaintiff.

**IV.   Motion to Strike.**

Ordinarily, "[j]udicial review of an ERISA plan administrator's decision on the merits is limited to the administrative record." *Montour*, 588 F. 3d at 632.  An exception arises when procedural irregularities by the administrator have "prevented the full development of the administrative record.  In that way the court may, in essence, recreate what the administrative record would have been had the procedure been correct." *Abatie*, 458 F.3d at 973.  The Court also has discretion to admit extrinsic evidence that relates to whether and to what extent the plan administrator had a conflict of interest. *Id*. at 970 ("The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict . . . has been established, by extrinsic evidence or otherwise.").

Defendants move to strike, as unsupported and outside the record, Kludka's statement that the SSA "reviewed Kludka's claim several years after it was approved and has never suspended or terminated benefits in almost 12 years." Doc. 61 at 1-2; *see* Doc. 60 at 2:24-3:2.  Striking this statement is not necessary because, as the Court noted above, Kludka's counsel confirmed at oral argument that the record contains no evidence

of the SSA determination or a later review.  The Court has taken this concession into account in its ruling.

Defendants move to strike deposition testimony of two Qwest claims managers. Doc. 61 at 2; *see* Docs. 58 at 4:1-3; 9:1-21; 60 at 2:4-6.  The Court previously rejected this testimony as outside the administrative record.  Doc. 45 at 20.  Although the Ninth Circuit has found that QDS made a procedural error when it failed to engage Kludka in a meaningful dialogue about how to perfect his claim, the deposition testimony does not serve to "recreate what the administrative record would have been had the procedure been correct."  *Abatie*, 458 F.3d at 973.  Instead, Kludka offers the deposition testimony as a way to document the procedural error itself (*see* Doc. 58 at 9; 60 at 2) or to call into question the merits of QDS's denial of benefits (Doc. 58 at 9).  Kludka argues that extrinsic evidence can also be used to show "any conflict of interest" and not just a structural conflict (Doc. 62 at 2), but does not explain how the deposition testimony shows a conflict of interest of any type.  The Court will strike this evidence because it is outside the administrative record and does not fit within either recognized exception.

Finally, Defendants move to strike all references to comments and questions by Judge Fletcher made during oral argument before the Ninth Circuit.  Doc. 61 at 2.  The Court's actions on remand have been guided by the Ninth Circuit's memorandum decision, not by comments of any individuals made during oral argument.  Were trial courts required to divine the intent of appellate courts on the basis of individual questions asked at oral argument, rather than the written opinions issued by the appellate courts, the task of following appellate guidance would be hopelessly ambiguous.  The Ninth Circuit panel spoke with one voice only in the order issued in this case.  The Court will grant Defendants' motion to strike Kludka's references to statements made at oral argument.

**IT IS ORDERED:**

1.  Defendants' motion for summary judgment is **granted** and Plaintiff's motion for summary judgment is **denied**.

2.  Defendants' motion to strike is **granted in part** and **denied in part** as set

forth in this order.

3.      The Clerk is directed to terminate this action.

Dated this 14th day of May, 2012.


                                          David G. Campbell
                                     United States District Judge